UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JODIE LYNN WATSON,

               Plaintiff,                    Case No. 2:17-cv-11978
                                          District Judge Gershwin A. Drain
v.                                      Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 14), GRANT DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (DE 17) and AFFIRM THE
COMMISSIONER'S DECISION**

**I.     RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 17),

and **AFFIRM** the Commissioner's decision.

**II.    REPORT**

        Plaintiff, Jodie Lynn Watson, brings this action under 42 U.S.C. § 405(g)

and 42 U.S.C. § 1383(c)(3) for review of a final decision of the Commissioner of

Social Security ("Commissioner") denying her applications for disability income

(DI) and supplemental security income (SSI) benefits.  This matter is before the

United States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (DE 14), the Commissioner's cross-motion for summary judgment (DE 17), and the administrative record.  (DE 11.)

### A.    Background and Administrative History

Plaintiff alleges that her disability began on January 1, 2013, at the age of 45.  (R. at 181, 188.)  She lists several conditions (stage 4 multiple sclerosis (MS), chronic fatigue, depression, asthma, allergies to mold & mildew, muscle weakness, cramps in bilateral extremities, memory loss, and clinically isolated syndrome (CIS) relapsing) that limit her ability to work.  (R. at 216.)  Her applications were denied on August 22, 2014.  (R. at 86-115, 119-137.)

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (R. at 139-140.)  ALJ Brian Garves held a hearing on February 16, 2016, at which Plaintiff, who was represented by counsel, and vocational expert (VE) Adolf Cwik testified .  (R. at 45-85.)  He issued an opinion on March 9, 2016.  (R. at 25-44.)  Pursuant to 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), at **Step 1** of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2013, the alleged onset date.  (R. at 30.)  At **Step 2**, the ALJ found that Plaintiff had the following severe impairments:  MS, depression, and anxiety.  (*Id*. at 30-31.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically

2

equaled the severity of one of the listed impairments.  (*Id*. at 31-33.)  Between

**Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual

functional capacity ("RFC")[1] and determined that Plaintiff had the RFC to perform

light work but with the following limitations:

> . . . she can lift and carry 20 pounds occasionally and 10 pounds
> frequently; can sit for six hours in an eight hour day and stand and
> walk for four hours in an eight hour day, provided that she can
> alternate between standing/walking and sitting every 30 minutes [*i.e.,*
> *exertional limitations*]; can frequently handle, finger, and feel objects
> bilaterally [*i.e., manipulative limitations*]; can occasionally climb
> ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never
> climb ladders, ropes, or scaffolds [*i.e., postural limitations*]; must
> avoid concentrated exposure to extreme cold, extreme heat, and
> irritants such as odors, fumes, dusts, gasses, and poor ventilation;
> must avoid concentrated exposure to unprotected heights and moving
> machinery [*i.e., environmental limitations*]; is limited to simple
> routine, and repetitive tasks; cannot work at a production pace rate or
> meet strict quota requirements, but will meet all end of day goals; is
> limited to simple work-related decisions; and can frequently interact
> with supervisors, co-workers, and the public [*i.e., mental RFC*
> *assessment*].

(*Id*. at 33-38.)  At **Step 4**, the ALJ determined that Plaintiff was unable to perform

any past relevant work.  (R. at 38.)  At **Step 5**, considering Plaintiff's age,

education, work experience, and RFC, the ALJ determined that there were jobs that

existed in significant numbers in the national economy that Plaintiff could perform.

(R. at 39-40.)  The ALJ therefore concluded that Plaintiff had not been under a

---

[1] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d
235, 239 (6th Cir. 2002).

disability, as defined in the Social Security Act, from January 1, 2013 through the date of the decision. (R. at 40.)

On April 27, 2017, the Appeals Council (AC) denied Plaintiff's request for review. (R. at 1-6, 16-24.) Thus, ALJ Garves's decision became the Commissioner's final decision. Plaintiff timely commenced the instant action on June 21, 2017.

**B.    Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the

court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## C.   Analysis

Plaintiff sets forth three arguments, two of which concern the ALJ's treatment of the opinion evidence and one of which concerns medical equivalence

at Step 3.  (DE 14 at 5, 8-17.)  The Commissioner argues that her decision is

supported by substantial evidence.  (DE 17 at 1, 3, 13-26.)

### 1.      The ALJ's treatment of opinion evidence

ALJ Garves states that he "considered opinion evidence in accordance with

the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p

and 06-3p."  (R. at 33.)  Relevant to Plaintiff's appeal, the ALJ assigned:

- "little weight" to Steven Beall, M.D.'s August 14, 2014 opinion (R. at 326)

- "great weight" to Robert Nelson, M.D.'s August 22, 2014 physical RFC assessment for the period April 24, 2014 to present (R. at 93-95; *see also* R. at 107-109)

- "little weight" to George Pestrue, Ph.D.'s June 18, 2014 medical source statement (R. at 324)

- "some weight" to Robert Newhouse, M.D.'s August 11, 2014 mental RFC assessment (R. at 95-97; *see also* R. at 109-111)

(R. at 37-38.)

### a.      Multiple Sclerosis

### i.      Neurologist Steven Beall, M.D.'s records

On May 7, 2013, Dr. Beall diagnosed Plaintiff with clinical isolated

syndrome (CIS).  (R. at 340-341.)  Dr. Beall's treatment of Plaintiff continued for

approximately two years:

- On June 18, 2013, Dr. Beall again diagnosed CIS but also noted that Plaintiff lacked "time criteria for the diagnosis of [MS]"

and lacked "space criteria as well since the periventricular lesion was only 2.6 mm and not 3 mm."  (R. at 338-339.)

- On July 18, 2013, Dr. Beall noted that Plaintiff "had complete reversal of the partial paralysis that had been going on for months, with only 3 days of prednisone."  (R. at 336-337.)

- On September 24, 2013, Dr. Beall noted "a second attack lasting greater than 24 hours," and diagnosed "relapsing [CIS]." (R. at 334-335.)

- On October 15, 2013, Dr. Beall stated that Plaintiff "now fulfills McDonald et al. 2010 criteria for the diagnosis of [MS]."  (R. at 332-333.)

- On November 22, 2013, Dr. Beall noted, *inter alia*, that Plaintiff had not gotten her Tecfidera® "because of problems with her insurance[,]" and concluded that Plaintiff needed "to have her lymphocyte sub panels and JCV antibody level as well."  (R. at 308, 330.)[2]

- On January 9, 2014, Dr. Beall determined that Plaintiff "fit[] [the] criteria for treatment with immunomodulatory agents." (R. at 307, 329.)

- On February 6, 2014, Dr. Beall was "[s]till trying to help [Plaintiff] get her BETASERON."  (R. at 328.)

- On April 24, 2014, Dr. Beall noted that Plaintiff was "[d]oing very well on the BETASERON[,]" and "had a rapid reversal of the partial paralysis that has been going on for months."  (R. at 327.)

- On May 29, 2014, Dr. Beall noted that Plaintiff "had a perfect neurological exam ever since being on the BETASERON."  (R. at 358-359.)

---

[2] Tecfidera® (dimethyl fumarate) "is a prescription medicine used to treat people with relapsing forms of multiple sclerosis."  *See* https://www.tecfidera.com (last visited Aug. 14, 2018).

- On July 10, 2014, Dr. Beall noted "some side effects of early reconstitution of her nervous system[,]" cut her BETASERON, and started low dose Gabapentin and Baclofen.  (R. at 356.)

- On August 14, 2014, Dr. Beall noted that Plaintiff "took herself off the BETASERON about 2 weeks ago."  Dr. Beall's impressions included that Plaintiff "had another attack of her disease."  Dr. Beall also discussed the effects of her symptoms upon her ability to work and function.  His disposition noted, in part, "[w]e are going to take a holiday."  (R. at 326.)

- On September 12, 2014, Dr. Beall still diagnosed MS.  He and Plaintiff discussed other treatments, but Plaintiff "want[ed] to continue on her drug holiday."  (R. at 357, 390.)

- On December 4, 2014, Dr. Beall noted "another attack," was "looking for an absolute lymphocyte count[,]" and placed Plaintiff on TECFIDERA.  (R. at 355, 389.)

- On February 26, 2015, Dr. Beall noted "rapid reversal of the quadriparesis that had been going on for two months with just three days of Prednisone . . . ."  Plaintiff did not want to go on any other medicines.  (R. at 354.)

- *On April 11, 2015, Plaintiff saw neurologist Fadi Delly, M.D., M.S. for a second opinion.  Dr. Delly did not feel that Plaintiff had MS and suspected neuropathy, noting that "[f]urther investigations w[ould] be undertaken."  (R. at 352-353, 350.)*

- On April 30, 2015, Plaintiff saw Dr. Beall, who noted "an ongoing attack[,]" but that Plaintiff "d[id] not want to take any immunomodulatory agents . . . ."  (R. at 351.)

On April 15, 2016, Dr. Beall completed an MS medical source statement.  (R. at 408-411.)  This record post-dates ALJ Garves's decision but was submitted to the AC.  (R. at 4-5.)

### ii.     The ALJ's physical RFC assessment & discussion of Dr. Beall's records

Even after determining that Plaintiff's asthma was non-severe, the ALJ included several environmental restrictions.  (R. at 31.)  Later, after performing a detailed review of Dr. Beall's records from May 2013 through April 2015, the ALJ set forth the following, lengthy explanation for the assessed physical RFC:

> In order to account for the claimant's reduced strength, weakness, and pain as reported in the medical records, I have limited the claimant to only light exertional work with no more than four hours of standing and walking, and the ability to alternate between standing/walking and sitting every 30 minutes.  Due to the claimant's weakness in her upper extremities, as documented in the records, I have limited her to frequent, as opposed to constant, handling, fingering, and feeling with both upper extremities.  The claimant's overall weakness, numbness, and fatigue as reported in the records further limits her postural activities as identified in the residual functional capacity, with her fatigue additionally requiring her to avoid concentrated exposure to heights and moving machinery.

(R. at 35.)

### iii.     The ALJ's assignment of weight to Dr. Beall's opinion

Within his discussion of the opinion evidence, ALJ Garves assigned "little weight" to Dr. Beall's August 14, 2014 statements that Plaintiff's demonstrated fatigability "severely limits her ability to work[,]" and that various symptoms put "severe problems on her functioning."  (R. at 37, 326.)  The ALJ offered a lengthy explanation, which Plaintiff attacks sentence-by-sentence (*see* DE 14 at 10-12), and the Court will address these arguments in *seriatim*:

9

- "As an initial matter, I note that the opinion is vague and does not actually specify any limitations, instead noting only that she will have general problems functioning, which renders it less persuasive."

Plaintiff argues that Dr. Beall's August 14, 2014 conclusions and examination findings "concisely state medical examination findings[,]" such that they are identical to then-effective Listing 11.09C. (DE 14 at 10-11.)[3] However, even if Dr. Beall's neurological examination and impressions are not vague in their observations, Plaintiff has not demonstrated how these findings are not accommodated by the existing physical RFC's exertional, manipulative, postural and environmental limitations, which the ALJ assessed to accommodate her "reduced strength, weakness, and pain," "weakness in her upper extremities," and "overall weakness, numbness, and fatigue." (R. at 35.) Moreover, as the Commissioner points out, the disability determination explanation acknowledges Dr. Beall's comment about Plaintiff's ability to work as "reserved for the Commissioner." (DE 17 at 15, R. at 88, 93, 102, 107.)

- "Further, the opinion is inconsistent with Dr. Beall's records documenting occasional exacerbations of the claimant's conditions followed by 'complete reversal' of her symptoms. (4F/2, 11; 5F/10 [R. at 327, 336, 354])."

---

[3] Plaintiff refers to the April 1, 2015 edition of Listing 11.09C, which required: "Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective January 2, 2015 to May 17, 2015).

True, the definition of MS provides that "characteristically, the plaques are 'separated in time and space' and *clinically the symptoms show exacerbations and remissions*."  Stedman's Medical Dictionary 802480 (Nov. 2014) (emphasis added).  However, while Plaintiff argues that "[t]he existence of remissions between relapses . . . provides no basis for the ALJ to refuse to accord Dr. Beall's opinion controlling weight[,]" (DE 14 at 11), the ALJ cited *reversals* in his decision, such as "rapid reversal of the partial paralysis," "complete reversal of the partial paralysis," and "rapid reversal of the quadriparesis . . . ."  (DE 17 at 17, R. at 34-35, 37, 327, 336, 354.)  *Reversals* are distinct from remissions.[4]

- "In this specific instance, Dr. Beall issued this opinion in August of 2014, after the claimant took herself off betaseron.  (4F/1 [R. at 326]).  However, by February of 2015, the first office visit after the claimant's 'drug holiday' and following just three days of steroid treatments, Dr. Beall noted a 'rapid reversal' of her symptoms and a physical examination lacking any significant abnormalities.  (5F/10 [R. at 354])."

Plaintiff challenges the ALJ's interpretations of the times she "was on or off medications[.]"  (DE 14 at 11-12.)  However, Dr. Beall's August 14, 2014 letter, in fact, states that Plaintiff "took herself off the BET[A]SERON 2 weeks ago[,]" and this was the visit at which Dr. Beall "was able to demonstrate fatigability on

---

[4] A reversal is "[a] turning or changing to the opposite direction, as of a process, disease, symptom, or state."  Stedman's Medical Dictionary 781040 (Nov. 2014). Remission is an "[a]batement or lessening in severity of the symptoms of a disease."  Stedman's Medical Dictionary 773850 (Nov. 2014).

multiple muscles."  (R. at 326.)  At the same visit, Dr. Beall stated:  "We are going

to take a holiday."  (*Id.*)  At the September 12, 2014 visit, Dr. Beall noted that

Plaintiff wanted "to continue on her drug holiday."  (R. at 357, 390.)  Although the

February 26, 2015 visit does not appear to be Plaintiff's first post-drug holiday

visit (*see* R. at 326, 354-355, 357 & 389-390), the ALJ accurately described Dr.

Beall's related letter, which noted, among other things, largely normal gait and

station (although positive Romberg), motor exam/tone, muscle strength testing,

coordination, and sensory exam (although touch was decreased in the right leg),

and further noted "rapid reversal of the quadriparesis that had been going on for

two months with just three days of Prednisone . . . ." (R. at 354.)

- "Moreover, Dr. Beall's longitudinal treatment and records fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact limited to the extent opined, as the record contains several progress notes indicating minimal physical examination abnormalities other than some muscle weakness since her alleged onset date.  (4F/2, 3, 4, 5, 8, 9, 11, 14, 15 [R. at 327-330, 333-334, 336, 339-340]; 5F/5, 7, 10, 11, 12, 14 [R. at 349, 351, 354-356, 358])."

Plaintiff argues that "instead of recognizing [muscle weakness] as a medical

finding that defines the condition [of MS]," the ALJ "somehow uses this as an

excuse to substitute his own medical judgment for that of Dr. Beall."  (DE 14 at

12.)  However, she does not explain how the various limitations in the physical

RFC, which the ALJ expressly designed to accommodate weakness (*see* R. at 35), fail to do so.

### iv.  Bowel/bladder issues

Finally, Plaintiff contends that the ALJ did not include limitations resulting from Plaintiff's bowel and bladder issues.  (DE 14 at 12.)  True, Dr. Beall's "review of systems" reflects genitourinary and/or gastrointestinal accidents within several of his notes from 2013 and 2014.  (R. at 326-328, 332, 336, 338, 390.)  In fact, the ALJ expressly cited various notes on these very issues, including the notes of August 14, 2014 (to which he assigned "little weight"), April 30, 2015, and perhaps even September 12, 2014.  (R. at 35, 37, 326, 351, 357, 390.)

Yet, despite Plaintiff's testimony about her bowel and bladder issues, such as that she urinates "once every half an hour depending on how much [she] drink[s][,]" or that her bowel issues include having "to get in the bathroom right away" normally "once a week . . . [,]" (R. at 65-66), or that she needed a bathroom break by the end of the hearing (R. at 84), Plaintiff has not described the related RFC limitation that she seeks.  Thus, she has not met her burden to challenge the ALJ's RFC determination as it relates to her bowel / bladder issues.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999) ("we reject the argument that if Residual Functional Capacity is not proven by the claimant before step five, the burden of proving it shifts to the Commissioner."); *Jordan v. Comm'r of Soc.*

*Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) ("The claimant, however, retains the burden of proving her lack of residual functional capacity.") (citing *Her,* 203 F.3d at 392).

### v.      Summation and medical judgment

Plaintiff argues that the ALJ "fail[ed] to accord appropriate weight" to Dr. Beall's opinion.  (DE 14 at 8-13.)  However, having previously identified Dr. Beall as Plaintiff's neurologist and having expressly cited several of  Dr. Beall's records from May 2013 through April 2015 (R. at 31, 34-35), it is clear that the ALJ considered the examining relationship, treatment relationship (which includes the sub-factors of length, frequency, nature and extent) and specialization factors.  20 C.F.R. §§ 404.1527(c)(1)-(2),(5), 416.927(c)(1)-(2),(5).  Moreover, having compared Dr. Beall's August 2014 opinion with several of his other records, it is also clear that the ALJ considered the supportability and/or consistency factors.  20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).  Thus, the ALJ considered several of the factors for weighing medical opinions and offered good reasons for the weight assigned to Dr. Beall's August 14, 2014 opinion(s).  20 C.F.R. §§ 404.1527(c)(2),(3), 416.927(c)(2),(3).  "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778,

785 (6th Cir. 2017), *cert. granted sub nom. Biestek v. Berryhill*, 138 S. Ct. 2677 (2018).

Within this statement of error, Plaintiff contends that the ALJ "stated several excuses for substituting his medical opinion for that of Dr. Beall . . . ." (DE 14 at 10.  Plaintiff is correct that "the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) (citations omitted).  However, the "excuses" to which Plaintiff refers are those points addressed above in the immediately preceding "assignment of weight" and "bowel/bladder issues" sections.  (*See* DE 14 at 10-11.)  "As the ALJ properly reviewed and weighed the reports to make a legal determination that is supported by substantial evidence, the assertion that the ALJ was 'playing doctor' is unsupported." *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 562 (6th Cir. 2014).  Plaintiff has not shown that the ALJ here exercised medical judgment, which would be beyond his expertise.  *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("the ALJ did not interpret raw medical data beyond her ability.").  Stated otherwise, the ALJ's treatment of the opinion evidence is sound.

### b.    Depression and Anxiety

#### i.    Consultative examiner George Pestrue, Ph.D.

On June 18, 2014, Dr. Pestrue performed a consultative examination.  (R. at 319-324.)  His medical statement explains:  "[Plaintiff's] medical problems will limit her ability to do most manual labor jobs.  Her MS appears to vary in severity and on bad days she is basically functionally unable to do anything.  Her depression leaves her tired and lacking in motivation.  She has stress triggered panic attacks."  (R. at 324.)  He diagnosed Plaintiff with "major depression, single episode, moderate," panic disorder, and generalized anxiety disorder.  (*Id*.)  ALJ Garves identified Dr. Pestrue as a consultative examiner and, ultimately, assigned his opinion "little weight," with the following justification:

> Dr. Pestrue is not a medical doctor, yet the more severe limitations contained in his opinion relate to the claimant's physical impairment, namely multiple sclerosis.  Thus, the opinion appears to rest, at least in part, on an assessment of an impairment outside the doctor's area of expertise.  Further, Dr. Pestrue's opined mental health restrictions are vague and lack specificity regarding the claimant's functional abilities, rendering it less persuasive.  Finally, the record as a whole does not support this portion of the opinion, since the claimant did not require any medication, therapy, or other specialized treatment for her mental health impairments, repeatedly demonstrated normal mood, affect, and orientation, and testified at the hearing that her depression symptoms have improved while she has learned to manage her anxiety.  (1F/7, 10, 14; 2F/2; 5F/5, 9 [R. at 295, 298, 302, 317, 349, 353]).

(R. at 32, 36, 37-38.)

### ii.      SSA consultant Robert Newhouse, M.D.

On August 11, 2014, SSA consultant Dr. Newhouse performed a mental RFC assessment and opined that Plaintiff:  **(a)** had moderate limitations in her

ability to understand and remember detailed instructions; and, **(b)** was moderately

limited in several aspects of sustained concentration and persistence.  (R. at 95-97,

109-111.)  Dr. Newhouse gave Dr. Pestrue's opinion "great weight" for its

apparent consistency with medical evidence of record.  (R. at 97, 111.)  Dr.

Newhouse also explained that Plaintiff "may have trouble with complex detailed

tasks and function best in small familiar groups[,]" and "retains the [ability] to do

simple tasks on [a] sustained basis[.]"  (*Id.*)  The ALJ assigned Dr. Newhouse's

opinion "some weight[,]" with the following justification:

> The claimant's mental status examinations and normal psychiatric
> findings support Dr. Newhouse's opinion that the claimant retains the
> ability to do simple tasks on a sustained basis, as do her reports of
> improvement in her mental health symptoms.  (1F/7, 10, 14; 2F/2;
> 5F/5, 9 [R. at 295, 298, 302, 317, 349, 353]; Hearing testimony).
> Further, I have included restrictions regarding the claimant's social
> interactions allowing for only frequent interaction with supervisors,
> co-workers, and the public, but *the record does not indicate the
> claimant requires interaction with only small familiar groups*.  She is
> able to shop in stores, attend appointments, attend meetings, and go to
> community sport events and school concerts.  (3E [R. at 223-232]).

(R. at 38 (emphasis added).)

### iii.    The ALJ's mental RFC assessment

As noted above, the ALJ assessed Plaintiff's mental RFC as "limited to

simple routine, and repetitive tasks; cannot work at a production pace rate or meet

strict quota requirements, but will meet all end of day goals; is limited to simple

work-related decisions; and can frequently [as opposed to constantly] interact with

supervisors, co-workers, and the public." (R. at 33, 36.) These limitations were based on Plaintiff's mental health impairments, including "symptoms of racing thoughts, low self-esteem, and agitation as reported in the records," as well as Plaintiff's "irritability, anxiety, and depressed mood . . . ." (R. at 36.)

### iv.    Discussion

Plaintiff argues that the ALJ did not accord appropriate weight to Drs. Pestrue and / or Newhouse's opinions. (DE 14 at 13-15.) More specifically, given Dr. Newhouse's statement that Plaintiff "may have trouble with complex detailed tasks and function best in small familiar groups[,]" Plaintiff claims that "the ALJ substituted his own medical judgement" for Dr. Newhouse's when stating that "the record does not indicate the claimant requires interaction with only small familiar groups." (DE 14 at 14-15, R. at 38, 97, 111.) Yet, in arriving at this statement, the ALJ permissibly informed his decision from the "shopping," "hobbies and interests," and/or "social activities" sections of Plaintiff's function report. (R. at 38, 228-229 (Questions 16, 18-19).)[5]

Plaintiff contends that this does not provide an excuse for "the ALJ's substitution of his medical judgment for that of Dr. Newhouse." (DE 14 at 15.) The Court should disagree. As the Commissioner points out, under the social security regulations, "the ALJ is charged with the responsibility of evaluating the

---

[5] As the ALJ's List of Exhibits indicates, the record copy of Plaintiff's Function Report is missing questions 1-5 (Page 1). (R. at 42, 223-232.)

medical evidence and the claimant's testimony to form an 'assessment of [her] residual functional capacity.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (quoting 20 C.F.R. § 416.920(a)(4)(iv)).  Also, the ALJ is not prohibited from relying upon Plaintiff's testimony where it contradicts the opinion of an SSA consultant who has performed a review of Plaintiff's medical records and drawn a conclusion based upon a CE report.  *See*, *e.g.*, *West v. Com'r Soc. Sec. Admin.*, 240 F. App'x 692, 697 (6th Cir. 2007) ("the ALJ did not err in refusing to give probative weight to a treating physician's opinion that is contradicted by statements from the claimant himself.").  The ALJ's comment that "the record does not indicate the claimant requires interaction with only small familiar groups[,]" (R. at 38) is not an exercise of medical judgment beyond the ALJ's expertise.  *See*, *e.g.*, *Meece*, 192 F. App'x at 465; *Rudd*, 531 F. App'x at 727.

Finally, even if the ALJ erred by favoring Plaintiff's function report representations, either because they do not indicate group sizes, the familiarity of those with whom she finds herself, or the frequency and duration of the described activities (DE 14 at 15), two of the jobs about which the VE testified and upon which the ALJ based his Step 5 finding are rated "not significant" for "taking instructions-helping."  (R. at 39, 82.)  *See also* DICOT 559.687-074 ("Inspector and Hand Packager") (Jan. 1, 2016); DICOT 729.687-010 ("Assembler, Electrical Accessories I") (Jan. 1, 2016).  Thus, assuming *arguendo* that the ALJ erred in his

judgment about Plaintiff's ability to work in groups, it would not appear to effect the ALJ's Step 5 determination.

### 2.     Step 3 listing determinations

In his statement of the issues, Plaintiff argues that the ALJ did not "have medical support for his conclusion that Plaintiff's medical impairments did not meet or equal the severity of any condition in the Listing of Impairments[.]" (DE 14 at 5.) His corresponding argument focuses on the SSA reviewing consultant's opinions and the absence of an opinion on medical equivalence. (DE 14 at 15-17.)

### a.     Dr. Nelson's physical RFC assessment

Preliminarily, Plaintiff takes issue with the split nature of the SSA medical consultant's physical RFC assessment. (DE 14 at 15-16.) On August 22, 2014, Dr. Nelson recognized that Plaintiff had "documented multiple sclerosis." (R. at 91, 104.) However, Dr. Nelson's opinions cover two time periods: **(i)** For the period from January 1, 2013 (the alleged onset date) to April 24, 2014, Dr. Nelson found that there was "insufficient [medical evidence of record] to assess the severity, or [her] limitations[,]" (R. at 90-91, 104-105); and, **(ii)** his physical RFC assessment covers the period from April 24, 2014 to present (then August 22, 2014) (R. at 93-95, 107-109).

Preliminarily, Plaintiff questions the significance of April 24, 2014. (DE 14 at 16.) As best the Court can tell, Plaintiff was released from employment with

Ogemaw Commission on Aging, effective April 23, 2014, "due to safety concerns relating to inconsistent ability to reliably assist clients with activities of daily living."  (R. at 207, 251.)  The following day, Plaintiff saw Dr. Beall, who noted she was "[d]oing very well on the BETASERON[,]" and "had a rapid reversal of the partial paralysis that has been going on for months."  (R. at 327.)  Perhaps more importantly, Dr. Nelson stated:  "Most recent neuro [office visit] shows improvement with treatment and above RFC is reasonably supported from 4/24/14 with consideration for fatigue."  (R. at 95, 109.)  Dr. Nelson having provided a physical RFC assessment based on the period from April 24, 2014 "to present," it is not clear that his statement on the prior period has any significance to Plaintiff's present appeal.

### b.    Dr. Newhouse's mental RFC assessment

Plaintiff next takes issue with the opinion of the SSA psychological consultant, Dr. Newhouse.  (DE 14 at 16.)  On August 18, 2014, after determining that Plaintiff's multiple sclerosis, affective disorders and anxiety disorders were "severe," Dr. Newhouse determined that Plaintiff's affective and anxiety-related disorders did not "precisely satisfy the diagnostic criteria" of Listings 12.04 or 12.06.  (R. at 91-92, 105-106.)[6]  Plaintiff argues that Dr. Newhouse "failed to state

---

[6] The Court assumes that the absence of a "PRT Assessment" for Listing 11.09 (Multiple Sclerosis) is due to MS not requiring a *Psychiatric* Review Technique. (*See* R. at 91-92, 105-106.)

any opinion" as to "whether the impairments met or medically equaled those listings for any date range."  (DE 14 at 16.)

### c.    Medical equivalence

### i.    Physical impairments

At Step 2, the ALJ found Plaintiff's MS to be severe.  (R. at 30.)  Still, at Step 3, the ALJ found that Plaintiff's condition did not meet or equal Listing 11.09:

> The listing requires that an individual have multiple sclerosis with one of the following:  disorganization of motor function; visual or mental impairment as described in listing 2.02, 2.03, 2.04, or 12.02; or significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.  The claimant consistently demonstrated a normal gait with normal muscle tone and normal coordination.  (1F; 4F; 5F; 6F).  She also has no documented visual or mental impairment that satisfies any of the listings, with no specialist treatment for any visual concerns.  While the claimant's neurologist Steven Beall, M.D., documented reproducible fatigue in August of 2014, this finding appears to be an isolated event immediately following the claimant's own decision to stop taking her medication, and Dr. Beall continued to note the claimant's normal gait and muscle tone even during this office visit.  (4F/1 [R. at 326]).

(R. at 31.)  Assuming that these various record cites are those cited in greater detail during the ALJ's RFC discussion of MS (*see* R. at 34-35), the ALJ's Step 3 conclusions about the severity of Plaintiff' MS are accompanied by citations to several of Dr. Beall's records.

### ii.      Mental impairments

At Step 2, the ALJ found that Plaintiff's severe impairments included depression and anxiety.  (R. at 30.)  Then, at Step 3, the ALJ found that "[t]he severity of [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06."  (R. at 31.) In concluding that Plaintiff has mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence or pace (CPP), the ALJ cited Plaintiff's function report (R. at 223-232 [Ex. 3E]) and Dr. Pestrue's CE report (R. at 319-325 [Ex. 3F]).  (R. at 32.)

### iii.      Discussion

Plaintiff claims that the ALJ "did not cite any medical basis for his conclusion that none of Plaintiff's impairments, either separately or in combination, met or equaled the requirements of any Listing."  (DE 14 at 16, R. at 31-33.)  This assertion is unavailing, given the ALJ's above-discussed citations to Dr. Beall's records and Dr. Pestrue's CE report (R. at 31-32) and the ALJ's later assignment of weight to certain of their opinions (R. at 37-38).

Plaintiff also argues that the ALJ did not comply with SSR 96-6p, which concerns "consideration of administrative findings of fact by state agency medical and psychological consultants and other program physicians and psychologists at

23

the administrative law judge and appeals council levels of administrative review[,]" and "medical equivalence." (DE 14 at 16-17.)[7] Among other things, SSR 96-6p provides that ALJs and the AC "may not ignore these opinions and must explain the weight given to these opinions in their decisions." SSR 96-6p(2). However, as set forth above, the ALJ expressly considered Dr. Nelson and Dr. Newhouse's opinions within the RFC determination and afforded them "great weight" and "some weight," respectively. (R. at 37-38.) In addition, "the physician's signatures on the SSA-831-U5 [disability determination and transmittal] forms are proof that a physician designated by the Secretary has considered whether the claimant's impairments are medically equivalent to an impairment described in the Listings." *Curry v. Sec'y of Health & Human Servs.*, 856 F.2d 193 (6th Cir. 1988). In Plaintiff's case, as with the typewritten "signature" pages on the disability determination explanations (DDEs), only Dr. Nelson's typewritten name appears on the Forms SSA-831-C3 for Plaintiff's DIB and DI claims. (R. at 99, 113, 114, 115.)

---

[7] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-06-di-01.html (last visited Aug. 2, 2018), slightly more than a year after the ALJ's March 9, 2016 decision. Even if the Appeals Council was bound by SSR 17-2p at the time of its April 27, 2017 denial, the AC considered the reasons Plaintiff disagreed with "the decision" and, by reference to the "additional evidence" listed in its order, also considered Dr. Beall's April 15, 2016 medical source statement. Then, it found that "this information does not provide a basis for changing the [ALJ's] decision." (R. at 2, 4-5, 20, 408-411.)

SSR 96-6p also provides that "[a]n updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made."  SSR 96-6p(3).  This ruling's policy interpretation goes on to say:

> When an administrative law judge or the Appeals Council finds that an individual[']s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant.  However, an administrative law judge and the Appeals Council *must* obtain an *updated* medical opinion from a medical expert in the following circumstances:
>
> • When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> • When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council *may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments*.
>
> When an *updated* medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, *the administrative law judge must call on a medical expert*.  When an *updated* medical judgment as to medical equivalence is required at the Appeals Council level in either of the circumstances above, the Appeals Council must call on the services of its medical support staff.

(*See* https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-06-di-01.html (internal footnote omitted) (emphases added) (last visited Aug. 2, 2018).)  Plaintiff claims

that "a medical expert opinion was clearly required as the ALJ had <u>NO</u> medical opinion regarding medical equivalence to support his finding[.]" (DE 14 at 17.) However, Plaintiff has not shown that either of the above conditions requiring an updated medical opinion has been met. Moreover, Dr. Newhouse's opinions are dated August 11, 2014 and August 18, 2014 (R. at 92, 97, 106, 111), and Dr. Nelson's opinion is dated August 22, 2014 (R. at 91, 95, 99, 105, 109, 113). The negative finding as to equivalency was made, as explained above. If Plaintiff is attempting to argue that evidence post-dating these state agency opinions necessitates an updated medical opinion, his statement of error fails to point the Court's attention toward it.

### D. Conclusion

For the foregoing reasons, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 17), and **AFFIRM** the Commissioner of Social Security's decision.

## III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  August 16, 2018          s/Anthony P. Patti
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE

## <u>Certificate of Service</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on August 16, 2018, electronically and/or by U.S. Mail.

s/Michael Williams_____
Case Manager for the
Honorable Anthony P. Patti
